T.C. Memo. 2021-127

UNITED STATES TAX COURT

LOUIS P. SMALDINO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5437-18.                          Filed November 10, 2021.

<u>Lavonne D. Lawson</u> and <u>Charles W. Morris</u>, for petitioner.

<u>Jenny R. Casey</u>, <u>Emerald G. Smith</u>, and <u>Kim-Khanh Nguyen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Petitioner owned and operated numerous rental properties in southern California.  He placed 10 of these properties in Smaldino Investments, LLC (LLC), which he owned through a revocable trust.  In 2013 he transferred about 8% of the LLC class B member interests to the Smaldino 2012 Dynasty Trust (Dynasty Trust), an irrevocable trust that he had created a few

[*2] months earlier for the benefit of his children and grandchildren. Around the same time, petitioner purportedly transferred about 41% of the LLC class B member interests to his wife, Agustina Smaldino, who purportedly retransferred them to the Dynasty Trust the next day.

On petitioner's 2013 gift tax return, he reported as a taxable gift only the approximately 8% of the LLC class B membership interests he had transferred directly to the Dynasty Trust. Respondent determined that petitioner had made a taxable gift to the Dynasty Trust of 49% of the class B membership interests, including the approximately 41% interest that assertedly had passed from petitioner to the Dynasty Trust indirectly through Mrs. Smaldino. After revaluing the LLC interests, respondent determined that petitioner had a $1,154,000 gift tax deficiency for 2013.

The issues for decision are: (1) the proper characterization for gift tax purposes of petitioner's purported transfer of LLC class B member interests to Mrs. Smaldino followed by her purported retransfer of these same interests to the Dynasty Trust and (2) the fair market value of the LLC class B member interests that petitioner transferred, directly or indirectly, to the Dynasty Trust.

[*3]                    FINDINGS OF FACT[1]

The parties have stipulated some facts.  We incorporate by this reference the parties' stipulation of facts and the attached exhibits.  When he timely petitioned this Court, petitioner resided in California.

Petitioner's Background and Estate Planning

After practicing for a time as a certified public accountant and serving as the treasurer of a computer company, petitioner purchased his father's liquor store business, which he then operated for over 35 years.  He eventually expanded his business holdings to include apartment buildings, which he managed as a sole proprietor.  By 2008 he had sold all his liquor stores, and his only remaining business was owning and managing what ultimately became an $80 million portfolio of real estate.

Petitioner has been married to Mrs. Smaldino since 2006.  She has a master's degree in economics and since about 1995 has worked almost continuously in petitioner's businesses--first in his liquor-store business and, after a three-year interval, in his property-management business.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*4]    Petitioner has 6 children from a prior marriage and 10 grandchildren. Two of the children work in petitioner's property-management business.

In 2012, when he was 69, a health scare motivated petitioner to get his estate planning in order. He and Mrs. Smaldino agreed that she should have security in her own assets; they did not want her assets and his children's assets commingled as part of the estate plan. Petitioner wanted to pass his business to his children and grandchildren and to give many of his remaining assets to Mrs. Smaldino. Similarly, she wanted petitioner's progeny to have the property-management business.

Petitioner and Mrs. Smaldino developed a plan to provide his progeny a bundle of assets comprising certain properties in the property-management company and to provide her a separate group of assets that would far exceed any share that the children received. As explained below, this plan involved placing certain of petitioner's business properties in the LLC and then transferring interests in the LLC to a trust for the benefit of his children and grandchildren. Petitioner resolved to transfer up to 50% of the LLC interests, the maximum he could transfer without triggering reassessment of property taxes on the LLC's assets.

**[*5]** <u>Smaldino Investments, LLC</u>

Petitioner created the LLC in 2003, but it remained inactive until late 2012, when he transferred 10 of his real estate holdings to it. As trustee of the Smaldino Family Trust (a revocable trust that petitioner had created on the same day in 2003 as the LLC), he held all the ownership interests in the LLC and served as its manager.

The LLC's operating agreement distinguishes a "Member" from an "Assignee". A "Member" has both an economic interest in the LLC and the right to participate in the LLC's affairs. By contrast, the operating agreement defines an "Assignee" as a person who is assigned all or part of a member's economic interest but who lacks other rights accorded to members, such as the right to vote or participate in management or the right to obtain information about the LLC's business and affairs. The operating agreement expressly states: "'Member' as defined herein does not include an Assignee." It further states:

> 11.5 <u>Transfer and Assignment of Membership Interests</u>. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of such Member's Membership Interest, and no Assignee shall be admitted as a substituted Member, except as expressly provided for in Section 11.5(c) herein.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> (b) <u>Substitution of Members</u>. An Assignee of a Membership Interest shall have the right to become a substituted Member only if

[*6] (i) the requirements of this Section 11.5 are met, (ii) such Assignee executes an instrument satisfactory to the Board accepting and adopting the terms and provisions of this Operating Agreement, and (iii) such person pays any reasonable expenses in connection with such substituted Member's admission as a new Member. The admission of an Assignee as a substituted Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

(c) <u>Permitted Transfers</u>.  Subject to the provisions of Subparagraph 11.5(f)(iii), the Membership Interest of any Member may be transferred, and the Assignee thereof shall be admitted as a substituted Member, without the prior Written consent of the Board to:  (i) any other Member or (ii) a revocable or irrevocable trust for the benefit of the Member or the Member's children, grandchildren or other family members who are descendents [sic] of Louis P. Smaldino (or, where the Member is a trust, a revocable or irrevocable trust for the benefit of any beneficiary of the Member's trust who is otherwise a permitted transferee).

\*       \*       \*       \*       \*       \*       \*

(f) <u>No Effect to Transfers in Violation of Agreement</u>.  Upon any transfer of a Membership Interest in violation of this Section 11.5:

(i)  The transferee shall have no right to vote or participate in the management of the business, property, and affairs of the Company, or to exercise any rights of or to become a Member; and

(ii)  Such transferee shall be an Assignee and thereafter shall only receive the allocation of the Company's Net Income and Net Loss and shall receive those Distributions to which the transferor of such Economic Interest would otherwise be entitled under this Operating Agreement.

**[*7]** The LLC's operating agreement provides for class A voting units and class B nonvoting units, as "identified as such on Exhibit 'A'". Initially, exhibit A of the operating agreement identified 40 class A voting units and 960 class B nonvoting units, all held by petitioner as trustee of the Smaldino Family Trust. On April 1, 2013, exhibit A was amended to restate the membership interests as 10 class A voting units and 990 class B nonvoting units, all held by petitioner as trustee of the Smaldino Family Trust. This amendment indicates that petitioner executed it on April 1, 2013.

Smaldino 2012 Dynasty Trust

Petitioner created the Dynasty Trust to provide for his heirs. His son Allen Douglass Smaldino is the trustee. The trust's beneficiaries are five of petitioner's children and their children. Mrs. Smaldino is not a beneficiary of the trust. The trust agreement indicates that petitioner and Allen Douglass Smaldino executed it on December 21, 2012.

Transfers of LLC Interests

The following documents were executed as part of petitioner's family estate plan.

1. Petitioner, as trustee of the Smaldino Family Trust, executed a document captioned "ASSIGNMENT SEPARATE FROM CERTIFICATE", which states

[*8] that he "assigns and transfers" to Mrs. Smaldino a "sufficient number" of nonvoting units in the LLC "so that the fair market value of such nonvoting units as determined for federal gift tax purposes shall be Five Million Two Hundred Forty Nine Thousand One Hundred Eighteen and 42/100ths Dollars ($5,249,118.42)". Petitioner and Mrs. Smaldino decided upon this amount on the basis of her then-available Federal estate and gift tax exemption.[2] This document, which is signed by both petitioner and Mrs. Smaldino, states that it is "Effective: April 14, 2013" but does not indicate the date it was executed.

2. Mrs. Smaldino executed an "ASSIGNMENT SEPARATE FROM CERTIFICATE", which states that she "assigns and transfers" to Allen Douglass Smaldino, as trustee of the Dynasty Trust, nonvoting shares of the LLC that are described identically as in the certificate whereby petitioner had purportedly assigned these same LLC interests to her. This document, which is signed by both Mrs. Smaldino and Allen Douglass Smaldino, states that it is "Effective: April 15, 2013" but does not indicate the date it was executed.

3. Petitioner, as trustee of the Smaldino Family Trust, executed a document captioned "ASSIGNMENT SEPARATE FROM CERTIFICATE", which states that he "assigns and transfers" to Allen Douglass Smaldino, as trustee of the

---

[2]For tax year 2013 the basic exclusion amount was $5,250,000. Sec. 2010(c)(3); Rev. Proc. 2013-15, sec. 2.13, 2013-5 I.R.B. 444, 448.

[*9] Dynasty Trust, a "sufficient number" of nonvoting units in the LLC "so that the fair market value of such nonvoting units as determined for federal gift tax purposes shall be One Million Thirty One Thousand Eight Hundred Eighty One and 58/100ths Dollars ($1,031,881.58)." This document, which is signed by both petitioner and Allen Douglass Smaldino, states that it is "Effective: April 15, 2013" but does not indicate the date it was executed.

When the dust settled, the Dynasty Trust wound up with 49% of the LLC class B member interests that previously had belonged to petitioner.[3] Petitioner hired James A. Biedenbender to value a 49% ownership interest in the LLC class B units. In a report dated August 22, 2013, Mr. Biedenbender opined that "a 49% Class B units nonvoting member's interest in the Company [the LLC] as [of] April 15, 2013 for certain tax reporting requirements on Form 709, US Gift Tax Return" was $6,281,000.

In exchange for the use of Mrs. Smaldino's available Federal estate and gift tax exemption, on June 10, 2013, petitioner amended the Smaldino Family Trust to provide her additional moneys and properties. The LLC's operating agreement

_____

[3]More precisely, the Dynasty Trust ended up with 49% of the aggregated 1,000 class A voting units and class B nonvoting units, or 49.49% of just the class B nonvoting units. In this proceeding, perhaps rounding down 49.49% to 49%, the parties and their experts uniformly refer to the transfers in question as ultimately resulting in the Dynasty Trust's holding a 49% class B member interest. For simplicity, we refer to the subject interest in the same manner.

[*10] was never amended to account for any transfer of units to Mrs. Smaldino. However, exhibit A of the operating agreement was amended "as of April 15, 2013" to show the Dynasty Trust as holding a 49% ownership interest in the LLC (consisting of two blocks of class B nonvoting units--one of 409.5 units and the other of 80.5 units, representing 40.95% and 8.05%, respectively, of the 1,000 aggregated voting and nonvoting units) and to show petitioner, as trustee of the Smaldino Family Trust, as holding the remaining 51% ownership interest (consisting of 500 class B nonvoting units as well as the 10 class A voting units). This amendment is signed by petitioner as the LLC's manager but does not indicate the date on which it was executed.

Creation and Elimination of Guaranteed Payment

As originally drafted, the LLC's operating agreement provided that its manager, i.e., petitioner, was entitled to annual compensation of 10% of the LLC's annual net cashflow, subject to decrease at the manager's sole discretion. Before 2013 petitioner received no annual compensation from the LLC.

On April 15, 2013, the LLC's operating agreement was amended to delete the provision for manager compensation and instead to provide the class A voting member, i.e., petitioner, with guaranteed payments. The amended operating agreement states:

**[*11]**       "<u>Guaranteed Payment</u>" shall mean a guaranteed payment to be made to the Class A Voting Member in the amount of $10,000 per month, which is intended to constitute a guaranteed payment within the meaning of Code Section 707(c) and shall not be treated as a Distribution for purposes of computing the recipient's Capital Account.

The amendment further states that the LLC shall make monthly guaranteed payments beginning May 15, 2013, but that if the LLC is unable to make any payments because of insufficient funds, the class A voting member (i.e., petitioner) "shall promptly make Additional Capital Contributions sufficient to enable the Company to make such payments on a timely basis".  This amendment indicates that it was executed on April 15, 2013, by petitioner as trustee of the Smaldino Family Trust, which is identified, directly above his signature, as the LLC's "SOLE MEMBER".

On December 31, 2013, the LLC operating agreement was amended to delete the guaranteed payment provision and to restore the previously deleted provision for manager compensation (except increased from 10% to 20% of annual net cashflow).  The amendment indicates that petitioner and Allen Douglass Smaldino executed it on December 31, 2013.

**[*12]** The LLC's Partnership Returns

In 2014 the LLC filed its initial partnership tax return on Form 1065, U.S. Return of Partnership Income, for tax year 2013.[4] On the Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., attached to this Form 1065, the LLC listed petitioner as a 51% partner and the Smaldino Family Trust as a 49% partner for the whole year.[5] Mrs. Smaldino was not listed as a partner for any part of 2013.

On its 2013 Form 1065 the LLC also reported that in 2013 it had paid petitioner $40,000 in guaranteed payments and as of yearend 2013 had accrued a yearend liability of $40,000 "DUE TO MANAGER".

Gift Tax Returns

On his 2013 Federal gift tax return, petitioner reported a taxable gift to the Dynasty Trust of $1,031,882, described as "INTEREST IN SMALDINO

---

[4]Before 2013 the LLC was treated as a disregarded entity for income tax purposes. Unless it elects otherwise, an LLC with only one member is treated for income tax purposes as the member's sole proprietorship--otherwise known as a "disregarded entity". See sec. 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

[5]The listing of the Smaldino Family Trust as a 49% partner appears to have been in error. For subsequent years the LLC's Schedules K-1 listed the Dynasty Trust as the 49% partner.

[*13] INVESTMENTS, LLC". He did not elect to split the gift,[6] and he did not report any gift to Mrs. Smaldino.[7]

On her 2013 Federal gift tax return, Mrs. Smaldino reported a taxable gift to the Dynasty Trust of $5,249,118, described as "INTEREST IN SMALDINO INVESTMENTS, LLC". Mrs. Smaldino allocated against this transfer $5,249,118 of her $5,250,000 available Federal estate and gift tax exemption, resulting in zero reported gift tax due. She did not elect to split the gift.

Notice of Deficiency

By notice of deficiency respondent determined that for 2013 petitioner had a $1,154,000 deficiency in gift tax. The notice explained that respondent had determined that in 2013 petitioner had made taxable gifts totaling $8,180,000, made up of: (1) a $2,157,071 gift of the LLC interests that petitioner had made directly to the Dynasty Trust and (2) a $6,022,929 gift of the LLC interests that petitioner assertedly had made indirectly to the Dynasty Trust through Mrs. Smaldino.

---

[6]The gift-splitting election of sec. 2513 allows married couples to treat gifts to third parties as though made one-half by each spouse.

[7]Pursuant to sec. 6019(2) taxpayers are not required to file gift tax returns for transfers between spouses.

**[*14]**                                                    OPINION

I.       General Legal Principles

Section 2501 imposes a tax for each calendar year "on the transfer of property by gift" by any taxpayer. Section 2511(a) provides that this gift tax "shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible". If a donor transfers an interest in property to his or her spouse as a gift, the value of the property interest is generally allowable as a deduction in computing the donor's taxable gifts for the year. Sec. 2523(a).

II.      The Parties' Contentions

The parties agree that the total LLC units transferred to the Dynasty Trust as of April 15, 2013, constituted a 49% class B member interest in the LLC.[8] The parties disagree about the extent to which these transfers should be characterized as gifts from petitioner to the Dynasty Trust and the value of the transferred interests for gift tax purposes.

---

[8]Each of the transfer documents describes the transferred LLC interests not in terms of percentage interests but rather in terms of a defined value, i.e., a "sufficient number" of nonvoting units in the LLC "so that the fair market value of such nonvoting units as determined for federal gift tax purposes shall be" a specified dollar amount. Petitioner concedes that these defined value clauses do not define or limit the amount of his taxable gifts to be determined in this proceeding.

[*15] Petitioner contends that he gave to the Dynasty Trust only an 8.05% LLC class B member interest. He contends that the Dynasty Trust received the 40.95% LLC class B member interest as a gift from Mrs. Smaldino and not from him. He further contends that his 2013 gift tax return correctly reported the value of the 8.05% gift interest as $1,031,882, according to Mr. Biedenbender's appraisal, which opined that the fair market value of a 49% class B member interest in the LLC as of April 15, 2013, was $6,281,000.[9]

Respondent contends that petitioner made a taxable gift to the Dynasty Trust of a 49% class B member interest in the LLC, including an indirect gift of the 40.95% class B member interest that he purportedly transferred to Mrs. Smaldino and that she purportedly retransferred to the Dynasty Trust a day later. Although respondent determined in the notice of deficiency that the fair market value of the 49% class B member interest (the subject interest) was $8,180,000, in this proceeding he contends, on the basis of his expert's report and testimony, that the fair market value of the subject interest was actually $8,421,000.

III.    Sufficiency of Pleadings

At the conclusion of the trial, respondent's counsel made an oral motion to conform the pleadings to the proof to increase respondent's valuation of the subject

---

[9]The math is off slightly, presumably because of rounding.

**[\*16]** interest to $8,421,000, in accordance with his expert's report and testimony. On brief petitioner objects to the granting of respondent's motion on the ground that "respondent has not moved for leave to increase the deficiency."

Pursuant to Rule 41(b), respondent's failure to formally amend his pleadings to assert an increased deficiency is not necessarily fatal if the issue giving rise to an increased deficiency was tried with petitioner's express or implied consent. As the Court explained in McGee v. Commissioner, T.C. Memo. 2000-308, 2000 Tax Ct. Memo LEXIS 366, at \*19-\*20:

> Section 6214(a) provides that this Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount determined by the Commissioner in the notice of deficiency if the Commissioner asserts a claim at or before the hearing or rehearing. Consistent with the general mandate of section 6214(a), this Court generally will only exercise its jurisdiction over an increased deficiency where the matter is properly pleaded. See Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), affd. 738 F.2d 67 (2d Cir. 1984); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).

> Rule 41(b)(1), however, provides that when an issue not raised in the pleadings is tried with the express or implied consent of the parties, that issue is treated in all respects as if it had been raised in the pleadings. Thus, where respondent raises an issue that could result in an increased deficiency without formally amending his pleading and that issue is tried with petitioner's express or implied consent, the requirement in section 6214(a) that respondent make a claim for the increased deficiency is satisfied. See Woods v. Commissioner, 91 T.C. 88, 93 (1988).

**[*17]** In his pretrial memorandum filed about two weeks before trial respondent advised that his expert witness would testify that the fair market value of the subject interest was $8,421,000 and that respondent might move to conform the pleadings to the proof at trial. Petitioner received respondent's expert witness report well before the trial and never objected at trial to the introduction into evidence of the higher values found by respondent's expert. Petitioner cross-examined respondent's expert witness about his methodology. Petitioner has not expressly argued prejudicial surprise, and we see none. We conclude that the issue of a value for the subject interest higher than that determined in the notice of deficiency was tried with at least petitioner's implied consent, making formal amendment of the pleadings unnecessary, see Rule 41(b), and satisfying the requirement in section 6214(a) that respondent make a claim for the increased deficiency, see Woods v. Commissioner, 91 T.C. 88, 93 (1988). Accordingly, we will deny respondent's motion as moot.

IV.   Burden of Proof

Respondent bears the burden of proving that petitioner is liable for any increased deficiency. See Rule 142(a)(1). The burden of proof is otherwise on petitioner to show that respondent's determinations are incorrect.[10] See id.; Welch

---

[10]Petitioner does not contend and the record does not establish that he has

(continued...)

**[*18]** v. Helvering, 290 U.S. 111, 115 (1933).  For the most part, however, we decide this case on the basis of the preponderance of evidence in the record rather than by placement of the burden of proof.

## V.      The Purported Transfer to Mrs. Smaldino

It is well established that the substance of a transaction, rather than the form in which it is cast, determines the tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern. Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 265-267 (1958); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Stewart v. Commissioner, 714 F.2d 977, 988 (9th Cir. 1983), aff'g T.C. Memo. 1982-209.  Section 2511(a) implicitly embodies principles of substance over form by including "indirect" transfers in the definition of a taxable gift.  Sather v. Commissioner, 251 F.3d 1168, 1174 (8th Cir. 2001), aff'g in part, rev'g in part T.C. Memo. 1999-309.  Heightened scrutiny is appropriate in cases, such as this one, where all the parties to the transactions in question are related.  See Brown v. United States, 329 F.3d 664, 673 (9th Cir. 2003); Kuney v. Frank, 308 F.2d 719, 721 (9th Cir. 1962) ("Transactions between persons in a close family group, whether or not involving partnership interests,

---

[10](...continued)
met the requirements of sec. 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

**[\*19]** afford much opportunity for deception and should be subject to close scrutiny." (quoting H.R. Rept. No. 82-586, at 33 (1951), 1951-2 C.B. 357, 381)); Estate of Bongard v. Commissioner, 124 T.C. 95, 119 (2005) ("A transaction between family members is \* \* \* subjected to heightened scrutiny to ensure that it is not a sham or disguised gift.").

Respondent contends that the doctrine of substance over form demands that we disregard petitioner's purported transfer of the LLC member interests to Mrs. Smaldino and her purported retransfer of these same interests to the Dynasty Trust a day later because these actions were "part of a prearranged plan between all parties involved to effectuate the transfer of the ownership of the LLC" from petitioner to the Dynasty Trust. Respondent urges us to treat the two purported transfers, in accordance with their asserted substance, as an indirect gift from petitioner to the Dynasty Trust.

In support of his position, respondent relies on a line of cases in which the courts have employed substance over form principles to recharacterize multistep property transfers among related parties as indirect gifts between the persons who were determined to be, in substance, the actual donors and donees. See, e.g., Heyen v. United States, 945 F.2d 359 (10th Cir. 1991) (treating the decedent's inter vivos transfers of stock shares to multiple nonfamily members, who

[*20] immediately reconveyed the shares to members of the decedent's family, as indirect transfers from the decedent to the ultimate donees); Estate of Bies v. Commissioner, T.C. Memo. 2000-338 (treating the decedent's inter vivos transfers of closely held corporation stock to her daughters-in-law and granddaughter-in-law, each of whom immediately transferred the stock to her husband, as indirect transfers from the decedent to those husbands); Estate of Cidulka v. Commissioner, T.C. Memo. 1996-149 (treating the decedent's inter vivos transfers of stock to his daughter-in-law, who immediately transferred the stock to her husband, as gifts of minority stock interests to the decedent's son for purposes of valuing blocks of shares).

Petitioner counters that those cases are not controlling because none involved an interspousal transfer like the one at issue here. He does not expressly dispute, however, that the transactions in question were part of a prearranged plan to transfer ownership of 49% of the LLC class B member interests to the Dynasty Trust while using Mrs. Smaldino's estate and gift tax exemption. Indeed, petitioner testified that he intended for the properties in the LLC to be divided among five of his children, as beneficiaries of the Dynasty Trust, while Mrs. Smaldino would receive a larger share of assets that were "outside the LLC". Mrs. Smaldino testified that before the purported transfer in question she had already

**[\*21]** made "a commitment, promise" to her husband and family that she would transfer the LLC units to the Dynasty Trust. When asked on direct examination whether she could have changed her mind if she had wanted to, she responded: "No, because I believe in fairness."

Petitioner nevertheless urges that we should respect his purported transfer of the LLC member interests to Mrs. Smaldino because, he says, it was sanctioned by section 2523(a), which generally exempts interspousal transfers from gift tax. Petitioner cites the legislative history of section 2523(a), which indicates that in enacting this exemption of spousal gifts from the gift tax in 1981 (replacing a prior deduction limited to one-half of spousal gifts), Congress intended that a "husband and wife should be treated as one economic unit for purposes of estate and gift taxes, as they generally are for income tax purposes", so that "no tax * * * [is] imposed on transfers between a husband and wife." S. Rept. No. 97-144, at 127 (1981), 1981-2 C.B. 412, 461. Petitioner suggests that the legislative policies informing section 2523(a) negate the substance over form doctrine as respondent seeks to apply it in this case.[11] Consequently, petitioner urges, we should reject

---

[11]To be clear, the allowance of the marital deduction under sec. 2523(a) is not directly at issue in this case. Petitioner's 2013 gift tax return did not claim any marital deduction inasmuch as he did not report any gift to Mrs. Smaldino. Similarly, respondent's determination does not expressly address the allowability of any marital deduction inasmuch as it treats the transfer in question as an indirect

(continued...)

**[*22]** respondent's recharacterization of the purported interspousal transfer of the LLC member interests as an indirect gift from petitioner to the Dynasty Trust.

Pursuant to its terms, however, section 2523(a) applies in the first instance only if the donor "transfers * * * an interest in property" to his or her spouse. For the reasons discussed below, we conclude that petitioner's actions were ineffective to transfer membership interests in the LLC to Mrs. Smaldino. Consequently, section 2523(a) is inapplicable, and we agree with respondent that in substance the Dynasty Trust received all its membership interests from petitioner.

As a threshold matter, we observe that petitioner's execution of a certificate of assignment to Mrs. Smaldino, although a factor to be considered, is not controlling. The courts have "never regarded 'the simple expedient of drawing up papers,' * * * as controlling for tax purposes when the objective economic realities are to the contrary." Kerr v. Commissioner, 113 T.C. 449, 464 (1999) (quoting Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1979)), aff'd, 292 F.3d 490 (5th Cir. 2002). "[E]xecution of a gift document, alone, is not a sufficient objective manifestation of an intent to donate. * * * Circumstances surrounding the writing must show that the writing was meant to be effective." Linton v. United States, 630 F.3d 1211, 1218-1219 (9th Cir. 2011).

_____

[11](...continued)
gift from petitioner to the Dynasty Trust.

[*23] Consonant with these principles, "courts have often recognized that the tax consequences of a transaction involving a nominee or straw party must be determined with regard to the true beneficial interests involved. '[Transactions] which do not vary, control or change the flow of economic benefits, are to be dismissed from consideration'". Snyder v. Commissioner, 66 T.C. 785, 791 (1976) (quoting Higgins v. Smith, 308 U.S. 473, 476 (1940)); cf. sec. 1.704-1(e)(2)(i), Income Tax Regs. ("The reality of the transfer and of the donee's ownership of * * * [an interest in a partnership] attributed to him are to be ascertained from the conduct of the parties with respect to the alleged gift and not by any mechanical or formal test.").

The LLC's operating agreement distinguishes the assignment of economic rights in the LLC from the transfer of membership interests. It states that "[n]o member" shall be entitled to transfer or assign any part of the member's ownership "except as expressly provided for in Section 11.5(c)". Section 11.5(c), captioned "Permitted Transfers", expressly provides for transfers of membership interests, without prior board approval, only to (1) other members and (2) to trusts created for the benefit of petitioner's descendants (e.g., the Dynasty Trust). Petitioner's purported transfer to Mrs. Smaldino is not among the types of transfers "expressly provided for" in section 11.5(c).

**[\*24]** Under section 11.5(f) of the operating agreement, captioned "No Effect to Transfers in Violation of Agreement", upon any transfer of a membership interest in violation of section 11.5, the transferee is treated not as a member but as an assignee, lacking the full rights and privileges of a member. Under section 11.5(b), the assignee of a membership interest can become a "substituted member" only if certain conditions are met, including the assignee's execution of an instrument adopting the terms and provisions of the operating agreement. Nothing in the record suggests that Mrs. Smaldino ever executed any such instrument or otherwise suggests that under the terms of the operating agreement she would have received anything more than an assignee's interest in the LLC as a result of the purported transfer in question. Cf. McCord v. Commissioner, 120 T.C. 358, 371-373 (2003) (finding that for gift tax purposes the donors assigned only economic rights with respect to a limited partnership rather than all their rights as partners), rev'd on other grounds, Succession of McCord v. Commissioner, 461 F.3d 614 (5th Cir. 2006).

The record does not suggest that petitioner, in his dual roles as trustee of the Smaldino Family Trust and as manager of the LLC, gave express or implied consent for the admission of Mrs. Smaldino as a member in disregard of the operating agreement's restrictions. To the contrary, the record shows that on April

**[*25]** 15, 2013--a day after he purportedly transferred the LLC member interests to Mrs. Smaldino--petitioner executed an amendment to the LLC operating agreement (providing for guaranteed payments to himself) which identified the Smaldino Family Trust as the LLC's "SOLE MEMBER".

The LLC's operating agreement defines class A voting units and class B nonvoting units as those units "identified as such on Exhibit 'A'". Exhibit A was never amended to show that Mrs. Smaldino held any class B nonvoting units (or any other member interest). Instead, exhibit A of the operating agreement was amended only to show that as of April 15, 2013, the Dynasty Trust held a 49% member interest in the LLC (consisting of two blocks of class B nonvoting units-- one of 409.5 units and the other of 80.5 units, representing 40.95% and 8.05%, respectively, of the 1,000 aggregated class A voting units and class B nonvoting units) and to show petitioner, as trustee of the Smaldino Family Trust, as holding the remaining 51% member interest (consisting of 500 class B nonvoting units as well as the 10 class A voting units).

Notably, this amendment to the LLC's operating agreement, although purporting to be effective April 15, 2013, is undated (unlike all the other operating agreement amendments in the record). Also undated are the certificates of assignment from petitioner to Mrs. Smaldino, purporting to be effective April 14,

**[\*26]** 2013, and from petitioner to the LLC and from Mrs. Smaldino to the LLC, each purporting to be effective April 15, 2013. The missing dates take on added significance when we consider that the dollar amounts stated in the certificates of assignment, as well as the ownership percentages stated in the LLC operating agreement amendment, all depend directly on the Biedenbender valuation of a 49% class B nonvoting member interest.[12] The Biedenbender valuation report, however, is dated August 22, 2013--over four months after the transfers purportedly occurred. On the basis of all the evidence in the record we find it more likely than not that the undated certificates of assignment and associated operating agreement

---

[12]Mr. Biedenbender's report opined that the fair market value of "49%, Class B nonvoting" units was $6,281,000. This amount equals (rounded to the nearest dollar) the sum of the dollar values reported on the two certificates of assignment whereby petitioner purportedly transferred $5,249,118.42 of class B units to Mrs. Smaldino on April 14, 2013, and $1,031,881.58 of class B units to the Dynasty Trust on April 15, 2013. Consequently, the fair market values stated on the certificates of assignment are clearly based on Mr. Biedenbender's valuation. Moreover, these same valuations necessarily determined the LLC ownership percentages represented by these two blocks of the LLC class B units (40.95% and 8.05%, respectively) as stated in the LLC operating agreement amendment.

In this regard, we note that the parties have stipulated that petitioner and Mrs. Smaldino decided on the $5,249,118.42 amount stated in the certificate of assignment from him to her "by determining Mrs. Smaldino's available [F]ederal estate and gift tax exemption." We do not view this stipulation as contrary to our conclusion that the exact dollars-and-cents value stated in the certificate of assignment was derived from the Biedenbender valuation by allocating to Mrs. Smaldino an LLC ownership percentage that would result in a value approximating but not exceeding her available $5,250,000 estate and gift tax exemption.

[*27] amendment were executed no earlier than August 22, 2013.[13] Given that this date is more than four months after the stated effective dates of the purported transfers of the LLC membership interests to both Mrs. Smaldino and the Dynasty Trust, as a practical matter there was never a time when Mrs. Smaldino would have been able to effectively exercise any ownership rights with respect to any LLC membership interests. Moreover, for the reasons previously discussed, we do not believe that petitioner ever intended for her to do so.

Finally, the LLC's 2013 partnership return reported that in 2013 the only partners were petitioner with a 51% interest (ostensibly by virtue of his role as trustee of the Smaldino Family Trust) and the Smaldino Family Trust with a 49% interest.[14] The LLC did not report Mrs. Smaldino as being a partner at any time.

On the basis of all the evidence in the record, we conclude that petitioner never effectively transferred any membership interest in the LLC to Mrs. Smaldino and consequently that the Dynasty Trust received its entire 49% of the class B membership interests as a gift from petitioner. Accordingly, we sustain

---

[13]This conclusion aligns with the fact that the Smaldino Family Trust was identified as the LLC's "SOLE MEMBER" on April 15, 2013, when (as previously noted) petitioner signed an amendment to the LLC operating agreement.

[14]This seemingly erroneous attribution of a 49% interest to the Smaldino Family Trust was corrected on the LLC's 2014 partnership return to show the 49% interest as belonging to the Dynasty Trust.

**[*28]** respondent's determination that for tax year 2013 petitioner made a taxable gift to the Dynasty Trust of a 49% class B member interest in the LLC.

VI.     Valuation of the 49% Class B Member Interest

    A.     General Valuation Principles

We must now determine the value of the 49% class B member interest in the LLC as of April 15, 2013, when it was transferred to the Dynasty Trust.

A gift of property is valued as of the date of the transfer. Sec. 2512(a). If property is transferred for less than adequate and full consideration, then the excess of the value of the property transferred over the consideration received is generally deemed a gift. See sec. 2512(b). A gift is measured by the value of the property passing from the donor, rather than by the property received by the donee or upon the measure of enrichment to the donee. See sec. 25.2511-2(a), Gift Tax Regs. Typically, we consider information available on or close to the valuation date and facts that were reasonably known on the valuation date. Estate of Gilford v. Commissioner, 88 T.C. 38, 52-53 (1987).

For gift tax purposes, the value of the transferred property is generally the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S.

[*29] 546, 551 (1973) (quoting section 20.2031-1(b), Estate Tax Regs.); see sec. 25.2512-1, Gift Tax Regs. The determination of property value for gift tax purposes is an issue of fact, and all relevant factors must be considered. See Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), aff'g in part and remanding T.C. Memo. 1956-178; LeFrak v. Commissioner, T.C. Memo. 1993-526.

For gift tax purposes, transfers of interests in a single-member LLC are valued as transfers of interests in the LLC rather than as transfers of proportionate shares of the underlying assets. See Pierre v. Commissioner, 133 T.C. 24 (2009), supplemented by T.C. Memo. 2010-106.

B. Expert Opinions

The parties rely on expert opinions to value the subject interest. We evaluate expert opinions in the light of all the evidence in the record and may accept or reject the expert testimony, in whole or in part, according to our own judgment. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Mellinger v. Commissioner, 112 T.C. 26, 39 (1999). "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based." Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998). We may be selective in our use of any part of an expert's opinion. See id.

[*30]    1.    The Biedenbender Report

Petitioner relies on the expert opinion of Mr. Biedenbender, a certified public accountant and appraiser at BizValPlus, Inc. Mr. Biedenbender opined that the fair market value of a 49% class B member interest as of April 15, 2013, was $6,281,000, calculated as follows. Mr. Biedenbender first determined the LLC's net asset value (NAV) as of April 15, 2013, to be $26,795,639. On this basis he estimated the fair market value of a 49% class B member interest in the LLC (before discounts and other adjustments) to be $13,130,000.[15] From this amount he subtracted $2,928,000, which he estimated to be the present value of petitioner's rights to guaranteed payments under the LLC's operating agreement as in effect on April 15, 2013. To the resulting $10,202,000 he applied a 38.43% combined discount for lack of control and lack of marketability to conclude that the net fair market value of a 49% class B member interest in the LLC was $6,281,000.

    2.    The Eichorst Report

Respondent relies on the expert opinion of Jared Eichorst, a principal at AltaView Advisors, LLC, and formerly a manager with Deloitte Transactions and

---

[15]The math appears to reflect rounding. Although Mr. Biedenbender's report suggests at various places that the guaranteed payment amount was subtracted after application of discounts, his cover letter calculation can be duplicated only by applying the discounts after subtracting the guaranteed payment as described above.

[*31] Business Analytics, LLP, where he was the national practice leader for estate and gift tax valuations of closely held investment holding entities. Mr. Eichorst opined that the fair market value of a 49% class B member interest as of April 15, 2013, was $8,421,000, calculated as follows. Using the adjusted NAV method, Mr. Eichorst first determined the LLC's fair market value as of April 15, 2013, to be $26,852,186. To this value he applied a 36% combined discount for lack of control and lack of marketability to arrive at an aggregate equity value of $17,185,399. Multiplying this value by 49% he determined that the fair market value of a 49% class B interest was $8,421,000 (rounded). Mr. Eichorst opined that the class A guaranteed payment rights did not affect the value of the class B member interests.

C.     Net Asset Value

Both experts agree that the preferred approach to valuing the subject interest begins with determining the LLC's NAV, calculated by subtracting the market value of its liabilities from the market value of its assets. Indeed, the experts are only $56,547 apart in their opinions as to the LLC's NAV: $26,795,639 according to Mr. Biedenbender versus $26,852,186 according to Mr. Eichorst. The experts agree about the values of the LLC's 10 real estate properties, which are the LLC's principal assets. The Eichorst report also includes, however, certain incidental

[*32] assets that are omitted from the Biedenbender report, e.g., $200,000 of fixtures, furniture, and equipment. Other differences, such as slightly higher mortgage balances reflected in the Eichorst report as compared to the Biedenbender report, cut in petitioner's favor. Mr. Eichorst's report indicates, and petitioner does not dispute, that he identified and valued the LLC's assets and liabilities on the basis of the LLC's internally prepared balance sheets, adjusting the reported values to April 15, 2013. Mr. Biedenbender's report does not completely explain how he identified the LLC's assets and liabilities or why certain incidental assets appear to have been omitted. Finding the Eichorst report more reliable than the Biedenbender report in this regard, we accept its conclusion that the LLC's NAV as of April 15, 2013, was $26,852,186.

D.    Guaranteed Payments

On April 15, 2013, the LLC's operating agreement was amended to provide petitioner, as the sole class A member, a guaranteed payment of $10,000 per month beginning May 15, 2013. The record indicates that the LLC paid or accrued $80,000 in guaranteed payments to petitioner during 2013 ($10,000 per month for eight months). On December 31, 2013, the LLC's operating agreement was amended to delete the provision for guaranteed payments. The parties and their experts disagree primarily on whether the provision for guaranteed payments

[*33] should be separately taken into account in valuing the subject interest and, if so, in what manner.

Mr. Biedenbender treated the guaranteed payment as an annuity of $10,000 per month for 40 years. He calculated the present value for this "annuity" to be $2,928,000 using a risk-free long-term monthly applicable Federal rate (AFR) of 2.67% as in effect in April 2013. He subtracted this amount from what he determined to be the fair market value of a 49% class B member interest in the LLC before applying discounts.

By contrast, Mr. Eichorst concluded that the guaranteed payment rights should not be taken into account in valuing the transferred class B member interests because, he opined, the guaranteed payments would not affect the fair market value of the LLC using the NAV approach and would not change the discounts needed to properly value the LLC. He opined that the guaranteed payments are comparable to asset management fees paid by comparable real estate investment holding companies, the values of which would not ordinarily be affected by asset management fees within the range indicated by the amounts of the guaranteed payments.

Petitioner counters that Mr. Eichorst has mistakenly equated guaranteed payments and management fees. Petitioner asserts that "any buyer of the minority

[*34] interest at issue in this case would fully understand that the operating agreement requires Mr. Smaldino, as the voting member, be paid the guaranteed payment whether or not entity level management fees are paid." Petitioner further asserts that "it remains common sense that the minority interest in question is less marketable than a similar interest not constrained by the guaranteed payment required and payable to the voting member" under the LLC operating agreement.

In support of his position petitioner points to chapter 14 of the Code, which imposes special rules for valuing retained interests in multitiered family partnerships. Section 2701 (which is in chapter 14) applies when a parent--such as petitioner--transfers certain partnership interests to family members while retaining an interest in the partnership after the transfer. Specifically, if the parent retains an "applicable retained interest", including a "distribution right", it is usually valued at zero.[16] See sec. 2701(a)(3)(A), (b)(1)(A). The statute expressly provides,

_____

[16]As an exception to this general rule, an applicable retained interest is not valued at zero if it is a qualified payment right. For this purpose, a "qualified payment" is defined as a cumulative dividend payable periodically at a fixed rate or a comparable payment under a partnership interest. Sec. 2701(c)(3)(A). Qualified payments rights are generally valued under normal valuation procedures using appropriate market discount rates. See Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates, and Gifts, para. 136.2.8 (2021), Westlaw FTXIEG. The similarity between guaranteed payment rights and qualified payment rights has led one commentator to observe that "even if a guaranteed payment were governed by § 2701, it would constitute a qualified payment right and thus would be subject to the same fair market value principles as a guaranteed

(continued...)

**[*35]** however, that "any right to receive any guaranteed payment described in section 707(c) of a fixed amount" is not a "distribution right". Sec. 2701(c)(1)(B)(iii). Hence, such a right is not an "applicable retained interest" within the meaning of section 2701(b)(1), and chapter 14 does not mandate that it be valued at zero.

Petitioner asserts, and respondent does not expressly dispute, that the guaranteed payment rights in question were designed specifically to qualify under section 707(c). Hence, petitioner reasons, under chapter 14 these guaranteed payment rights are not to be disregarded in the valuation process.

Neither party has otherwise argued the applicability of chapter 14 to this case, and we surmise that petitioner does not mean to suggest that chapter 14 should apply to this case other than to support his favored treatment of guaranteed payments. It is instructive, however, to consider the valuation methodology of chapter 14 more comprehensively. For those situations in which section 2701 applies, the value of the junior interest transferred is generally calculated by subtracting the value of the senior interests (including rights to distribution of

---

[16](...continued)
payment not subject to § 2701, with a couple of exceptions." Louis S. Harrison, "Special Valuation Rules Can Save Transfer Taxes", 11 J. Partnership Tax'n 239, 247 n.29 (1994). Neither party has argued that the guaranteed payments at issue in this case constitute qualified payment rights under sec. 2701.

[*36] income or capital that are preferred to rights of the transferred interest) from the aggregate value of all family-held equity interests and then allocating the remaining value among the transferred interest and other interests of the same or junior classes. See sec. 25.2701-3(b)(1) through (3), Gift Tax Regs. The amount thus allocated to the transferred interest is then reduced to take into account minority and similar discounts, as appropriate. Id. subpara. (4); see Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates, and Gifts, para. 136.2.8 (2021), Westlaw FTXIEG (describing subtraction method under section 2701).

We conclude that it is appropriate, in valuing the transferred class B units for gift tax purposes, to subtract from the LLC's NAV (before applying any discounts) the value of the class A units retained by petitioner, including the value of his priority claims, i.e., the guaranteed payments; to then allocate the remaining value among the transferred and retained class B units; and to then apply appropriate minority and marketability discounts to the transferred class B units. That approach is consistent not only with chapter 14 but also with this Court's decision in McCord v. Commissioner, 120 T.C. at 376--a case that did not involve the application of chapter 14. McCord involved the valuation for gift tax purposes of gift class B limited partner interests in a limited partnership. The class A limited partners' sole economic interest consisted of a guaranteed payment for the use of

[*37] their capital.  Id. n.12.  In valuing the gift class B limited partner interests,

the Court first subtracted from the partnership's NAV  (before applying any

discounts) the class A limited partners' priority claims against the partnership's

assets under the terms of the partnership agreement.[17]  Id. at 376.

In keeping with this methodology, we agree with petitioner that the

guaranteed payments should be taken into account in valuing the gift class B

interests.  We are unable, however, to agree with Mr. Biedenbender's methodology

in all respects.  For one thing, as respondent points out, Mr. Biedenbender has not

meaningfully explained why his calculation applies the risk-free AFR rate.[18]  On

brief, petitioner suggests that the AFR rate is appropriate because, he says, "[t]he

guaranteed payment is payable in all circumstances, whether the LLC has cash

flow or profit or not."  Petitioner's argument ignores, however, that under the

terms of the operating agreement, if the LLC is unable to make any guaranteed

---

[17]In McCord v. Commissioner, 120 T.C. 358, 376 (2003), rev'd on other grounds, Succession of McCord v. Commissioner, 461 F.3d 614 (5th Cir. 2006), the Court stated that it concurred with the methodology of the taxpayer's expert who "subtract[ed] $20,000 from * * * [the limited partnership's]  NAV to reflect the class A limited partner's $20,000 priority claim against * * * [the limited partnership's] assets under the terms of the partnership agreement."  The Opinion does not otherwise discuss the terms or valuation of the guaranteed payment.

[18]Respondent has not otherwise expressly disputed Mr. Biedenbender's treatment of the guaranteed payments as an annuity payable for 40 years.  We deem respondent to have waived or conceded any argument in this regard.

[*38] payments because of insufficient funds, the class A voting member (i.e., petitioner) "shall promptly make Additional Capital Contributions sufficient to enable the Company to make such payments on a timely basis." In effect, then, petitioner bore the risk of the LLC's inability to make guaranteed payments because of insufficient funds.

In his rebuttal expert report, Mr. Eichorst opines that a 6.75% discount rate is appropriate because, as he explains and petitioner does not expressly dispute, it is consistent with capitalization rates used in valuing the LLC's underlying assets. We find Mr. Eichorst's methodology more reliable than Mr. Biedenbender's in this regard. Accordingly, we accept Mr. Eichorst's use of a 6.75% discount rate. According to Mr. Eichorst's rebuttal expert report, adjusting Mr. Biedenbender's present value calculations to use this 6.75% discount rate yields a present value for the guaranteed payments of $1,647,412.[19]

We also agree with respondent that Mr. Biedenbender has incorrectly--and inconsistently with the methodology of chapter 14 on which petitioner selectively relies--deducted the full present value of the guaranteed payments against the 49% transferred class B member interest rather than against the entirety of class B

---

[19]More precisely, Mr. Eichorst calculated the present value of 49% of the guaranteed payments to be $807,232. This is mathematically equivalent to a present value of $1,647,412 ($807,232/.49) for 100% of the guaranteed payments.

**[*39]** member interests. We will make appropriate adjustments in this regard in our calculations below.

The LLC's operating agreement was amended on December 31, 2013, to eliminate the provision for guaranteed payments. Respondent argues that this is a reason to disallow any reduction in value of the subject interest by the present value of the future guaranteed payments. Generally, however, subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation. Olson v. United States, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value[.]"); First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985); Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Estate of Gilford v. Commissioner, 88 T.C. at 52. Respondent has not asserted that the elimination of the provision for guaranteed payments was reasonably foreseeable as of April 15, 2013, and has not otherwise advanced any meaningful argument as to why or how the eventual elimination of the provision for guaranteed payments should be factored into the valuation of the gift of the subject

[*40] interest as of April 15, 2013. Nor has respondent argued that the elimination of the provision for guaranteed payments on December 31, 2013, gave rise to a separate gift from petitioner to the other class B members at that time. We deem respondent to have waived any such arguments.[20]

E.      Discounts for Lack of Control and Marketability

In valuing the transferred class B member interests, Mr. Biedenbender applied a 38.43% combined discount for lack of control and lack of marketability. Mr. Eichorst applied a similar combined discount rate of 36%.

On brief petitioner asserts that Mr. Biedenbender's slightly higher combined discount rate is explained by his taking into account the guaranteed payment, which is not taken into account in Mr. Eichorst's analysis. Petitioner states: "The only significant difference between the appraisal reports as presented is the treatment of the required guaranteed payment."

As discussed supra, in valuing the transferred class B member interests we will make an appropriate adjustment for the value of the guaranteed payment rights

---

[20]For the sake of completeness, we note that sec. 2701(d) provides a lookback rule that requires an addition to be made to the transferor's taxable gifts or taxable estate if a qualified payment right is valued at an amount other than zero at the time of the sec. 2701(a) transfer but payments under the qualified payment right are not made as projected in the sec. 2701(a) valuation. See Bittker & Lokken, supra, para. 136.2.9. Respondent has not argued that sec. 2701(d) has any applicability to this case, and we deem any such argument to be waived.

**[\*41]** retained by petitioner. Consequently, it would be inappropriate to make redundant adjustments to the discount rate for these same guaranteed payment rights. See Shepherd v. Commissioner, 115 T.C. 376, 398 n.20 (2000), aff'd, 283 F.3d 1258 (11th Cir. 2002). Consequently, petitioner having advanced no other meaningful argument for Mr. Biedenbender's slightly higher combined discount rate, we will apply Mr. Eichorst's 36% combined discount rate.

## VII.   Summary and Conclusion

On the basis of all the evidence in the record, we conclude and hold that petitioner made a gift to the Dynasty Trust of 49% of the class B membership interests in the LLC. The value of this gift is $7,820,008, calculated as follows:

[*42] LLC's NAV as of 4/15/13     $26,852,186

| | |
|---|---:|
| Less: Value of retained class A member interests, including guaranteed payment rights[1] | (1,915,934) |
| Value allocated to aggregate class B member interests | 24,936,252 |
| Value allocated to 49% class B member interest before discounts[2] | 12,218,763 |
| Less: 36% combined discount | (4,398,755) |
| Value of transferred 49% class B member interest | 7,820,008 |

[1]The indicated value of the retained class A member interests is the sum of $1,647,412, representing the guaranteed payments' present value as of April 15, 2013, and $268,522, representing a 1% allocable share (10 class A units divided by 1,000 total LLC membership units) of the LLC's NAV of $26,852,186.

[2]Calculated as 49% of $24,936,252.

We have considered all other arguments the parties have advanced for different results. Arguments not expressly addressed herein we conclude are irrelevant, moot, or without merit.

<u>Decision will be entered under</u>

<u>Rule 155</u>.